IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel, KEITH EDWARDS appearing QUI TAM, | ) | FILED UNDER SEAL |
| Plaintiff/Relator, | ) | |
| v. | ) | 13-CV-0220 |
| JP MORGAN CHASE BANK, N.A., and JP MORGAN CHASE & COMPANY, | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

Relator Keith Edwards ("Relator") brings this qui tam action, and related causes of action, on behalf of the United States of America, against Defendant JP Morgan Chase Bank, N.A. and JP Morgan Chase & Company (collectively referred to herein as "JP Morgan Chase"), alleging for his First Amended Complaint as follows:

**INTRODUCTION**

1. This is a qui tam action under the False Claims Act ("FCA") by the United States of America, by Relator Keith Edwards, to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.*, arising from fraud on the United States Department of Housing and Urban Development ("HUD"), Veterans' Administration ("VA") and Government National Mortgage Association (commonly referred to and referred to herein as "Ginnie Mae" or "GNMA") in connection with JP Morgan Chase's residential mortgage lending business.

2. As set forth more fully below, JP Morgan Chase has profited for years from its position as one of the nation's largest residential mortgage lenders while submitting false statements to FHA and VA about its documentation, underwriting and its quality control. At the same time, JP Morgan Chase failed to implement quality control measures to stop the reckless lending that JP Morgan Chase engaged in. Not only has JP Morgan Chase's misconduct cost the United States millions of dollars, with additional losses expected in the future, but also it has led to mortgage defaults and home evictions and foreclosures across the country.

**PARTIES**

3. Relator Keith Edwards is a citizen of the United States and resides in the State of Louisiana, and pursuant to the aforementioned statutes, brings this action on behalf of the United States of America. From 2003 to 2008, Relator was employed by JP Morgan Chase (or its predecessors or affiliates). While employed there, Relator served as Assistant Vice President with oversight and management of its Government Insuring Unit.

4. Defendant JP Morgan Chase & Company is a diversified global financial services firm with offices throughout the country, including New York, New York. It is a Delaware corporation, headquartered in New York, New York. On May 30, 2008, J.P. Morgan Chase & Company acquired The Bear Stearns Companies, Inc. (now the Bear Stearns Companies LLC) by merger, including its subsidiary EMC Mortgage Corporation (now EMC Mortgage LLC). Defendant J.P. Morgan Chase Bank, N.A. is a national banking association. It is headquartered in Columbus, Ohio. On September 25, 2008, Washington Mutual Bank, F.S.B., a federal savings bank headquartered in Henderson, Nevada, failed, and J.P. Morgan Chase Bank, N.A., purchased substantially all of the assets and assumed all deposit and substantially all other liabilities of Washington Mutual Bank, F.S.B., pursuant to a Purchase and Assumption Agreement with the

Federal Deposit Insurance Corporation (FDIC) and the FDIC as Receiver for Washington Mutual Bank, F.S.B. Collectively, the two defendants identified in this paragraph are referred to here as "J.P. Morgan." The business of J.P. Morgan and its subsidiaries and affiliates include the origination and servicing of mortgage loans.

5.   HUD, through its Federal Housing Administration ("FHA"), insures lenders against losses due to homebuyers. FHA insures approximately one third of all new residential mortgages in the United States and is the largest mortgage insurer in the world. Under HUD's mortgage insurance program, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property. HUD incurs expenses in managing and marketing the foreclosed-upon property until it is resold.

6.   By protecting lenders against defaults on mortgages, FHA mortgage insurance encourages lenders to make loans to millions of creditworthy Americans who might not otherwise satisfy conventional underwriting criteria. FHA mortgage insurance also makes mortgage loans valuable in the secondary markets, as FHA loans are secured by the full faith and credit of the United States.

7.   The continued availability of FHA mortgage insurance, however, depends on HUD's ability to accurately assess the risk of default on the loans it insures. To accomplish this task, HUD promulgated extensive guidelines and regulations to ensure that only creditworthy borrowers are being insured, and HUD relies on certifications by lenders that the loans they submit for insurance comply with HUD standards and guidelines specifically designed to mitigate the risk to HUD.

8. Similarly, VA guarantees lenders against losses to homebuyers. Under VA's mortgage guaranty program, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, VA will pay the mortgage holder a percentage of the balance of the loan and assume ownership and possession of the property. VA incurs expenses in managing and marketing the foreclosed-upon property until it is resold.

9. By providing guarantees to lenders against defaults on mortgages, VA encourages lenders to make loans to millions of creditworthy Americans, including service members and eligible surviving spouses who might not otherwise satisfy conventional underwriting criteria. VA mortgage guarantee also makes mortgage loans valuable in the secondary markets, as VA loans are secured by the full faith and credit of the United States.

10. The continued availability of VA mortgage guarantees, however, depends on VA's ability to accurately assess the risk of default on the loans it insures. To accomplish this task, VA promulgated extensive guidelines and regulations to ensure that only creditworthy borrowers' loan are being guarantied, and VA relies on certifications by lenders that the loans comply with VA standards and guidelines specifically designed to mitigate the risk to VA.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, and the FCA, particularly 31 U.S.C. §3732(a), which specifically confers jurisdiction over actions brought pursuant to 31 U.S.C §3729 and §3730, and further, personal jurisdiction, in that some or all of the acts proscribed by §3729 as alleged herein occurred in the New York City, New York, and further, Defendants and each of them may be found in the District and transact business in this District as set forth above.

12. Venue is proper in this District pursuant to 28 U.S.C. §1391 and 31 U.S.C.§ 3732(a) because Defendants are found, transact business, and committed the acts alleged herein and proscribed by 31 U.S.C § 3729 in this District.

**CONDITIONS PRECEDENT**

13. Pursuant to 31 USC § 3729 et seq, this First Amended Complaint is to be filed *in camera* and under seal, and is to remain under seal for a period of at least sixty days and shall not be served on Defendants until the Court so orders. Further, the United States of America may elect to intervene and proceed with the action within the sixty day time frame after it receives both the First Amended Complaint and the material evidence submitted to it.

14. The allegations in this suit are not based on prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730, but rather information from Relator.

15. In the alternative, to the extent there has been a public disclosure unknown to Relators, they are an original source under the aforementioned statute. As more fully set forth in this First Amended Complaint, Relator has direct and independent knowledge of the information on which the allegations herein are based, and witnessed directly the actions and representations by JP Morgan Chase against the United States, its departments or agents.

16. Relator has voluntarily provided all of the material information alleged herein to the Federal government before filing this action based on said information.

17. Contemporaneous with filing this First Amended Complaint, Relator is serving a copy of same upon the United States, together with the aforementioned verbal and written

disclosure statements setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

18.     Relator has complied with all other conditions precedent to bringing this action.

## BACKGROUND

### I.     THE FHA MORTGAGE INSURANCE PROGRAM

19.     FHA, a part of HUD, is the largest mortgage insurer in the world, insuring approximately one third of all new residential mortgages in the United States.  Pursuant to the National Housing Act of 1934, FHA offers various mortgage insurance programs.  Through these programs, FHA insures approved lenders ("mortgagees") against losses on mortgage loans made to buyers of single-family housing.  The programs help low-income and moderate-income families become homeowners by lowering some of the costs of their mortgage loans.  FHA mortgage insurance encourages lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements.

20.     Under HUD's mortgage insurance programs, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property.  HUD also incurs expenses in managing and marketing the foreclosed-upon property until it is resold.  By protecting lenders against defaults on mortgages, FHA mortgage insurance encourages lenders to make loans to millions of creditworthy Americans who might not otherwise satisfy conventional underwriting criteria.  FHA mortgage insurance also make mortgage loans valuable in the secondary markets, as FHA loans are expected to have met HUD requirements and because they are secured by the full faith and credit of the United States.

21.     HUD's Direct Endorsement Lending program is one of the FHA-insured mortgage programs. A Direct Endorsement Lender is authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior HUD review or approval. To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD requirements (e.g., income, credit history, valuation of property, etc.).

22.     HUD relies on the expertise and knowledge of Direct Endorsement Lenders in providing FHA insurance and relies on their decisions. A Direct Endorsement Lender is therefore obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in dealings with HUD. The duty of good faith also requires a Direct Endorsement Lender to make full and fair disclosures to HUD of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

23.     A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. The underwriter must "evaluate [each] mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24C.F.R. §203.5(d).   In additional, the underwriter must "have [each] property appraised in accordance with [the] standards and requirements" prescribed by HUD 24 C.F.R. §203.5(e).

24.     Mortgagees must employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud; in addition, underwriting decisions must be performed with due diligence in a prudent manner. HUD Handbook 4000.4 REV-1, ¶2-4(

C)(5); *see also* HUD Handbook 4155.2 ¶2.A.4.b.  The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters.  HUD Handbook 4060.1 REV-2, ¶2-9(A).

25.     HUD relies on Direct Endorsement Lenders to conduct due diligence on Direct Endorsement loans.  The purpose of due diligence include (1) determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties, *see* 24 C.F.R §203.5(d), and (2) examining a property offered as security for the loan to determine if it provides sufficient collateral, *see* 24 C.F.R. §203.5(e)(3).  Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.  In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgage would be entirely dependent on the property as security to protect its investment." 24 C.F.R. §203.5(c).

26.     HUD has set specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires Direct Endorsement Lenders to be familiar with, and to comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed processing instructions to Direct Endorsement Lenders.  These materials specify the minimum due diligence with which Direct Endorsement Lenders must comply.

27.     With respect to ensuring that borrowers have sufficient credit, a Direct Endorsement Lender must comply with governing HUD Handbooks, such as HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans), to evaluate a borrower's credit.  The rules set forth in HUD Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the

ability and willingness to repay the mortgage debt. HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

28. To properly evaluate a borrower's credit history, a Direct Endorsement Lender must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interest parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for gaps in employment, when required; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

29. With respect to apprising the mortgaged property (*i.e.*, collateral for the loan), a Direct Endorsement Lender must ensure that an appraisal and its related documentation satisfy the requirements in governing HUD Handbooks, such as HUD Handbook 4150.2 (Valuation Analysis for Single Family One-to Four-Unit Dwellings). The rules set forth in HUD Handbook 4150.2 exist to ensure that a Direct Endorsement Lender obtains an accurate appraisal that properly determines the value of the property for HUD's mortgage insurance purposes.

30. Furthermore, to maintain HUD-FHA approval, a Direct Endorsement Lender must implement and maintain a quality control program. HUD requires the quality control department to be independent of mortgage origination and servicing functions. *See* HUD Handbook 4060.1 REV-1, ¶6-3(B); HUD Handbook 4060.1 REV-2, ¶7-3; HUD Handbook 4700.2 REV-1, ¶6-1(A). To comply with HUD's quality control requirements, a lender's quality control program must (among other things): (a) review a prescribed sample of all closed loan

files to ensure they were underwritten in accordance with HUD guidelines; and (b) conduct a full review of "all loans going into default within the first six payments," which HUD defines as "early payment defaults." HUD Handbook 4060.1 REV-1, ¶¶6-6(C), 6-6(D); HUD Handbook 4060.1 REV-2, ¶¶7-6(C), 7-6(D); HUD Handbook 4700.2 REV-1, ¶¶6-1(B), 6-1(D).

31.     In conducting a quality control review of a loan file, the lender must, among other things, review and confirm specific items of information. For instance "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written re-verification. Examples of items that must be reverified include, but are not limited to, the mortgagor's employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds." HUD Handbook 4060.1 REV-2, ¶7-6-(E)(2). Further, "[a]ny discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." *Id.; see also* HUD Handbook 4060.1 REV-1, ¶6-6(E)(2); HUD Handbook 4700.2 REV-1, ¶6-3(A)(2).

32.     The HUD Handbook lays out a rating system for the quality control reviews, in which the lender implements a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month's sample to previous samples so the mortgagee may conduct trend analysis." HUD Handbook 4060.1 REV-2, ¶7-4; *see also* HUD Handbook 4060.1 REV-1, ¶6-4. The ratings provided for this purpose are "Low", *i.e.,* no or minor violations, "Acceptable," *i.e.,* issues identified were not material to insurability of the loan, "Moderate," *i.e.,* significant unresolved questions or missing documentation created a moderate risk to the mortgagee and FHA, and "Material," *i.e.,* issues identified were material violations of FHA or mortgagee

requirements and represent an unacceptable level of risk, such that the loans must be reported to HUD. HUD Handbook 4060.1 REV-1, ¶6-4; HUD Handbook 4060.1 REV-2, ¶7-4.

33. Specifically, the HUD Handbook defines "Material Risk" loans as follows:

> The issues identified during the review were material violations of FHA or mortgagee requirements and represent an unacceptable level of risk. For example, a significant miscalculation of the insurable mortgage amount or the applicant[']s capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud. Mortgagees must report these loans, in writing to the Quality Assurance Division in the FHA Home Ownership Center having jurisdiction.

HUD Handbook 4060.1 REV-2, ¶7-4(D); *see also* HUD Handbook 4060.1 REV-1, ¶6-4(D).

34. Under HUD's rules, a lender must report to HUD (along with the supporting documentation) "[s]erious deficiencies, patterns of non-compliance, or fraud uncovered by mortgagees" during the "normal course of business and by quality control staff during reviews/audits of FHA loans" within 60 days of the initial discovery. HUD Handbook 4060.1 REV-1, CHG-1, ¶¶6-13(J); *see also* HUD Handbook 4060.1 REV-2, ¶7-3(J) (requiring Direct Endorsement Lenders to "immediately" report findings of "fraud or other serious violations" affecting an FHA loan); HUD Handbook 4060.1 REV-2, ¶2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.")[1] Upon making such findings, the lender must also expand the scope of the quality control review both by increasing the number of files reviewed and conducting a more in-depth review of the selected files.

35. Until 2005, HUD's rules instructed Direct Endorsement Lenders to make the required self-reports of loans with serious deficiencies, patterns of non-compliance, or fraud in writing to HUD through the Quality Assurance Division of the HUD Homeownership Centers ("HOCs") having jurisdiction. In May 2005, HUD issued Mortgagee Letter 2005-26, which

[1] Prior to November 2003, lenders were required to self-report to HUD loans affected by "significant discrepancies," such as "any violation of law or regulation, false statements or program abuses by the mortgagee, its employees, or any other party to the transaction." HUD Handbook 4060.1 REV-1, ¶6-1(H).

notified lenders that going forward they would have to participate in mandatory electronic reporting through HUD's online Neighborhood Watch system.  That new method became mandatory at the end of November 2005, and required mortgagees "to report serious deficiencies, patterns of non-compliance, or suspected fraud, to HUD in a uniform automated fashion" and in lieu of written reports to the various individual HOCs.

36.    In addition to reporting loans affected by fraud or other serious violations to HUD, the lender is required to take corrective action in response to its findings.  In particular, quality control review findings must "be reported to the mortgagee's senior management within one month of completion of the initial report" and "[m]anagement must take prompt action to deal appropriately with any material findings.  The final report or an addendum must identify the actions being taken, the timetable for their completion, and any planned follow-up activities." HUD Handbook 4060.1 REV-2, ¶7-3(I); *see also* HUD Handbook 4060.1 REV-1, ¶6-3(I); HUD Handbook 4700.2 REV-1, ¶6-1(F).  Appropriate action by management includes following up with underwriters responsible for material findings to ensure that they are properly trained and diligently reviewing each file before endorsing it for FHA mortgage insurance.

37.    Every Direct Endorsement Lender must make an annual certification of compliance with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan.  The annual certification states, in sum or substance:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies.  I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

Absent a truthful annual certification, a lender is not entitled to maintain its direct endorsement lender status and is not entitled to endorse loans for FHA insurance.

38.     In addition to the annual certification requirement, after each mortgage closing, the Direct Endorsement Lender must certify that the lender conducted due diligence and/or ensured data integrity such that the endorsed mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A. For each loan that was underwritten with an automated underwriting system approved by FHA, the lender must additionally certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id.* For each loan that required manual underwriting, the lender must additionally certify that the underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage." *Id.*

39.     Whether a loan is approved through automated or manual underwriting, the underwriter additionally must certify: "I, the undersigned, as authorized representative of mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4." *Id.* If the loan does not meet the requirements of HUD Handbook 4000.4, then it is not eligible for FHA insurance and cannot be certified for endorsement. Both the annual certification form and the individual loan certification forms are submitted to HUD electronically.

40.     HUD relies on each individual loan certification to endorse the loan and provide the lender with an FHA mortgage insurance certificate. Once a loan is endorsed for insurance, the loan receives a unique FHA case number. In the event that HUD later discovers that a loan was endorsed despite being ineligible for the FHA program, HUD seeks indemnification from the Direct Endorsement Lender that certified the loan via an indemnification agreement whereby the lender agrees to indemnify HUD should claims for FHA insurance be submitted on that loan.

41.     Whenever an FHA loan defaults and an insurance claim is submitted for processing through HUD's electronic claim system, the claim must include the FHA case number as well as the FHA mortgagee identifying number of the lender inputting the claim, which must be either the holder of record or the servicer of record of the mortgage. If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim.

42.     After a claim is submitted, HUD's electronic system will automatically conduct a series of edits to ensure data validity, date consistency and that reasonable and valid amounts are requested for reimbursement, including that the FHA insurance for the case number provided is in Active status and there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim. After a claim has passed all the electronic edits in the claim processing system, the claim is approved for payment and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of record.

43.     However, where a lender and HUD have entered into an indemnification agreement with respect to a particular loan, and an insurance claim is submitted with respect to that loan, if the holder of record to which claim proceeds would be disbursed is also the indemnifying lender, the electronic claim system will not process payment of the claim. But, if

the holder of record is not the lender that indemnified HUD for the loan, HUD will disburse payment to the holder of record, and then issue a billing letter to the indemnifying lender to recoup HUD's losses.

## II.     VA MORTGAGE GUARANTY PROGRAM

44.     VA helps service members, Veterans, and eligible surviving spouses become homeowners, and offers various mortgage guarantee programs. Through these programs, VA insures approved lenders ("mortgagees") against losses on mortgage loans made to buyers of single-family housing. The programs assist veterans and their families become homeowners by lowering some of the costs of their mortgage loans. A VA guaranty encourages lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements.

45.     Under VA's mortgage guaranty programs, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, VA will pay the mortgage holder a percentage of the balance of the loan and assume ownership and possession of the property. VA also incurs expenses in managing and marketing the foreclosed-upon property until it is resold. By protecting lenders against defaults on mortgages, VA guarantees encourage lenders to make loans to millions of creditworthy Americans who might not otherwise satisfy conventional underwriting criteria. VA guarantees also make mortgage loans valuable in the secondary markets, as VA loans are expected to have met VA requirements and because they are secured by the full faith and credit of the United States.

46.     A VA lender is authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for VA, and certify loans for VA mortgage guarantee without prior VA review or approval. To qualify for a VA guarantee, a mortgage must

meet all of the applicable VA requirements (e.g., income, credit history, valuation of property, etc.).

47.     VA relies on the expertise and knowledge of lenders in providing VA guarantees and relies on their decisions. A Lender is therefore obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in dealings with VA. The duty of good faith also requires a Lender to make full and fair disclosures to VA of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading VA in all circumstances.

48.     A Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. The underwriter must evaluate mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures. *See* 38 C.F.R. §36.4337.

49.     Mortgagees must employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud; in addition, underwriting decisions must be performed with due diligence in a prudent manner. The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters.

50.     VA relies on lenders to conduct due diligence. The purpose of due diligence include (1) determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties, and (2) examining a property offered as security for the loan to determine if it provides sufficient collateral. Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay,

cash to close, and collateral. In all cases, a Lender owes VA the duty, as prescribed by federal regulation and other rules, to exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgage would be entirely dependent on the property as security to protect its investment.

51.    VA has set specific rules for due diligence predicated on sound underwriting principles. Lenders are fully responsible for developing all credit information, i.e., for obtaining verifications of employment and deposit, credit reports, and for the accuracy of the information contained in the loan application. 38 C.F.R. §36.4337(j); *see also* VA Pamphlet 26-7, Lender's Handbook. Ch. 4 (Credit Underwriting).

52.    Lenders originating loans are responsible for determining and certifying to VA on the appropriate application or closing form that the loan meets all statutory requirements. Lenders affirmatively certify that loans were made in full compliance with the law and loan guaranty regulations. 38 C.F.R. §36.4337(k).

53.    To properly evaluate a borrower's credit history, a Lender must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interest parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for gaps in employment, when required; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by VA rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

54.    With respect to appraising the mortgaged property (*i.e.,* collateral for the loan), a Lender must ensure that an appraisal and its related documentation satisfy the requirements in

governing VA Handbooks. The rules set forth in VA Handbook exist to ensure that a Lender obtains an accurate appraisal that properly determines the value of the property for VA's mortgage guarantee purposes.

55. Furthermore, to maintain VA approval, a Lender must implement and maintain a quality control system which ensures compliance with VA requirements. 38 C.F.R. §36.4352(9). VA requires the quality control department to be independent of mortgage origination and servicing functions. 38 C.F.R. §36.4352(9)(iii).

56. In conducting a quality control review of a loan file, the lender must, among other things, review and confirm specific items of information. For instance "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written re-verification. Examples of items that must be reverified include, but are not limited to, the mortgagor's employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds." Further, "[a]ny discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed."

57. A Lender's quality control system shall ensure that effective corrective measures are taken promptly when deficiencies in loan originations are identified. 38 C.F.R. §36.4352.

58. A Lender's quality control plan must require prompt reporting of any violation of law or regulation, false statements, or program abuses by the Lender, its employees, or any other party to the transaction to the VA office of jurisdiction. VA Pamphlet 26-27, (Lender's Handbook), Chapter 1.

59. After each mortgage closing, the Lender must provide the following certification with each loan closing or assumption package:

> The undersigned lender certifies that the (loan) (assumption) application, all verifications of employment deposit, and other income and credit verification documents have been processed. In compliance with 38 C.F.R. part 36: that all credit reports obtained or generated in connection with the processing of this borrower's (loan (assumption) application have been provided to VA: that, to the best of the undersigned lender's knowledge and belief the (loan) (assumption) meets the underwriting standards recited in chapter 37 of title 38 United States Code and 38 C.F.R. part 36; and that all information provided in support of this (loan) (assumption) is true, complete and accurate to the best of the undersigned lender's knowledge and belief.

## III. JP MORGAN CHASE'S GOVERNMENT INSURING UNIT

60. Relator joined JP Morgan Chase in May 2003, and worked there until March 2008. Relator assisted in the oversight and management of its Government Insuring Unit relating to residential lending.

61. In May 2003, when Relator joined JP Morgan Chase, there was significant corporate emphasis placed upon the need for growth in loan production volume, revenue and profits.

62. In late 2002, JP Morgan Chase had retained consulting firm Profit Resources Inc. to support various ongoing Six Sigma initiatives relative to FHA Loans and to speed up and expedite issues relating to both FHA and VA loans.

63. When Relator was hired, JP Morgan Chase was in the process of working on plans to eliminate a significant backlog of work, controls and reporting on existing work and the development and implementation of a completely new organizational structure and workflow.

64. JP Morgan was attempting to significantly reduce the population of uninsurable loans. Among other profit oriented reasons, it expressly desired to drop the number of uninsurable loans, so "reserves against potential foreclosure losses can also drop adding to the net income of the company".

65.     JP Morgan Chase hired Relator to improve the performance of the Government Insuring Unit.

66.     At the time of Relator's hiring, JP Morgan noted that there was an overall weakness in the team leader positions, and a lack of urgency to accept the new process, noting "If the resistance continues or they cannot adapt, personnel changes may be required."

67.     Relator was informed "A direct result of the previous management decisions has been the lack of a formal training program.  Supervisors were not sent to FHA training sessions nor were staff exposed to outside training to develop expertise.  Tenure and on-the-job training was the rule.  The variations and requirements do not lend themselves to learning on the job without numerous rework and rejects from FHA."

68.     Relator was further advised there were "conflicting agendas with the Channels, Quality Assurance or Risk Management that interfere with the efficient and timely movement of files."

69.     In its quest to increase loan volume and obtain approval of loans by FHA and VA, JP Morgan Chase utilized a "submission matrix", which captured quantitative data from files rejected by FHA and VA.  Ignoring guidelines, the "submission matrix" focused on documents resulting in a high rejection rate.  If the document was not on the matrix, then the loan could be submitted in violation of guidelines with the understanding the agency may issue mortgage insurance despite the deficient documentation.  A qualification of having a FHA loan insured is that it must be less than 60 days old or if older than 60 days, the loan must have either zero delinquencies or have six months of consecutive on-time payments.  The VA delinquency requirement differs in that if a loan is submitted more than 60 days after loan closing, a statement signed by a corporate officer of the lender which identifies the loan, provides the specific reasons

for late reporting and certifies that the loan is current. In an effort to shift risk to FHA, JP Morgan Chase submitted loan files to FHA to beat the sixty (60) day period to avoid providing payment histories on a large percentage of file submissions.

70.     During the transition of responsibilities of the Government Insuring Unit to Relator in May 2003, the prior manager indicated this "submission matrix" was approved at levels higher than himself and would be tough to unwind due to fact it would drive an increase in the number of outstanding unendorsed loans and subsequently impact loan loss reserve requirements (causing more of funds to be set aside to cover the estimated loan loss of $30,000-$40,000 per unendorsed FHA loan). During this period FHA and VA were rejecting close to 25% of Chase Home Finance submissions.

71.     Shortly after becoming aware of the matrix, Relator instructed staff to discontinue this process and adjusted quality control measures to comply with FHA guidelines.

72.     The more stringent review of documents resulted in more unendorsed loans. In August of 2003 Relator was questioned by a member of the audit team about the increase of unendorsed loans. Relator indicated he had instructed staff to cease the practice of submitting loans to FHA without the required properly executed documentation.

73.     When informed of this development, the senior vice president of retail production operations responded angrily, "Who the hell told you to do that?" "Don't you understand that the uninsured numbers will increase"?

74.     Following the meeting in August 2003, a senior manager inquired if we "were we trying to get her fired". This comment was made in reference to Relator informing staff to cease submitting defective loans to FHA/VA, and bringing this up in a risk committee meeting. Relator was informed that the origination heads were not ready for any new process of

submitting fully documented files to FHA or VA. There was extreme resistance from origination heads relative to fixing upfront processes and cooperation relative to document collection due to fact it would deter focus from creating new loan production and impact revenues.

75.    The directive from management resulted in the policy of submitting files without all the necessary documentation.

76.    In September 2003, an internal audit was performed of the government insuring unit.    The post-closing section, which addressed adequate documentation, was given a "Gentlemen's D" on a scale of A to F.  The audit noted the excessive number of unendorsed loans with an emphasis on unendorsed loans greater than 60 days.  At the time, there were approximately 15,000 unendorsed loans with approximately 8,000 of those loans being older than 60 days from the date the loan was closed.

77.    Relator again communicated to management that the reason for the excessive number of unendorsed loans was because of lack of properly executed documentation required by FHA and VA prior to submission.

78.    In the fall of 2003, Relator began implementation of an in-house software solution in order to improve productivity and provide feedback to origination channels and underwriting relative to file quality.  The system was referred to as the Government Insuring Workflow System ("GIWS").

79.    In January 2004, Relator began providing feedback to origination channels and underwriting heads via weekly defect report cards which provided FHA defect rates along with defective document reasons in an attempt to improve performance and get them to provide adequate documentation.

80.    The feedback and report cards did not improve the documentation problem.

81.     In the summer of 2004, an internal audit was conducted and Relator informed the auditor that a directive existed from executive management of submitting loan files to the FHA and VA without all required documents with utilizing the flawed "submission matrix" rather than required guidelines.

82.     During 2004, Relator had numerous communications with management and others, but no corrective action was taken. In December 2004, Relator was asked to recant my position because of potential problems with the outside auditors.

83.     In early 2005, Relator was interviewed by the Office of Comptroller of Currency relating to a prior employer, and it was brought to Relator's attention that the submission of loans without proper documentation was in direct contradiction of the Lender Certification (HUD Form 92900a), and members of Relator's staff may be persons at risk by signing the lender certification.

84.     Relator immediately informed his staff to stop signing certifications, resulting in another internal investigation.

85.     Following the internal investigation, Government Insuring Staff was instructed not to sign the lender certifications, but instead they would be signed by loan officers or production operations staff.

86.     In the fall of 2005, Relator was re-assigned to a support role, with loans still being submitted without adequate documentation.

87.     Loans continued to be submitted without adequate documentation up through Relator's termination of employment in March, 2008.

88.     Weekly internal reports were generated by JP Morgan Chase reflecting 40% to 60% of FHA and VA loans were defective.  See Sample Reports from December, 2005 attached collectively as Exhibit 1.

89.     JP Morgan Chase has been and continues to be an approved FHA direct endorsement lender.  As a direct endorsement lender, JP Morgan Chase acts as a fiduciary of HUD, underwriting and endorsing mortgages as qualified for FHA insurance.  HUD requires a direct endorsement lender such as JP Morgan Chase to certify each year that JP Morgan complies with necessary HUD and FHA requirements, including those requiring implementation of a quality control program meeting HUD standards.  Further, HUD requires a lender such as JP Morgan Chase, for each mortgage endorsed, to certify that the lender has conducted due diligence and that the mortgage is eligible for FHA insurance.  HUD, which does not perform any pre-endorsement review of a loan, relies on these certifications.

90.     JP Morgan Chase has been and continues to be an approved VA lender.  VA requires a lender such as JP Morgan Chase, for each mortgage endorsed, to certify that the lender has conducted due diligence and that the mortgage is eligible for a VA guarantee.  VA, which does not perform any pre-endorsement review of a loan, relies on these certifications.

91.     The certification by JP Morgan Chase was false and JP Morgan Chase failed to report the false certifications.

## IV.     DEFENDANT'S ACTIONS HAVE RESULTED IN LOSSES TO THE UNITED STATES OF AMERICA

### A.     JP Morgan Chase's False Certifications to HUD Have Resulted in Losses

91.     HUD has paid FHA insurance claims relating to mortgages insured by FHA based on JP Morgan Chase's false certifications of due diligence and eligibility, similar to the examples

set forth in the previous section of this First Amended Complaint. HUD would not have made a financial commitment to pay such mortgage insurance claims absent JP Morgan Chase's false certifications.

92. JP Morgan Chase's false certifications, similar to the examples set forth in the previous section of this First Amended Complaint, were material and bore upon the likelihood that borrowers would make mortgage payments.

93. HUD paid millions in insurance claims and related costs arising out of JP Morgan Chase's approval of mortgages for FHA insurance. A substantial percentage of those claims resulted from loans that were ineligible for FHA insurance and never should have been insured.

94. HUD expects to pay millions of dollars in additional FHA insurance claims as additional mortgages underwritten by JP Morgan Chase's default in the months and years ahead.

95. The costs relating to FHA insurance claims paid by HUD to date and the costs relating to FHA insurance claims expected to be paid by HUD are the direct result of JP Morgan Chase's false certifications and representations described above.

**B. JP Morgan Chase's False Certifications to VA Have Resulted in Losses**

96. VA has paid VA guarantee claims relating to mortgages guaranteed by VA based on JP Morgan Chase's false certifications of due diligence and eligibility, similar to the examples set forth in the previous section of this Complaint. VA would not have made a financial commitment to pay such mortgage guarantee claims absent JP Morgan Chase's false certifications.

97. JP Morgan Chase's false certifications, similar to the examples set forth in the previous section of this Complaint, were material and bore upon the likelihood that borrowers would make mortgage payments.

98. VA paid millions in guarantee claims and related costs arising out of JP Morgan Chase's approval of mortgages for VA guarantees. A substantial percentage of those claims resulted from loans that were ineligible for VA guarantees and never should have been guaranteed.

99. VA expects to pay millions of dollars in additional VA guarantees as additional mortgages underwritten by JP Morgan Chase's default in the months and years ahead.

100. The costs relating to VA guarantees paid by VA to date and the costs relating to VA guarantee claims expected to be paid by VA are the direct result of JP Morgan Chase's false certifications and representations described above.

### C. Civil Statutes to Combat Mortgage Fraud

101. The False Claims Act provides liability for any person (I) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" 31 U.S.C. § 3729(a)(1)(A)-(B). The False Claims Act further provides that any person who violates the Act: "is liable to the United States of America for a civil penalty of not less than [$5,500] and not more than [$11,000]..., plus 3 times the amount of damages which the United States of America sustains because of the act of that person..." 31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

**FIRST CLAIM**

**Violations of the False Claims Act**
**(31 U.S.C. § 3729 (a)(1) (2006), and, as amended, 31 U.S.C. § 3729 (a)(1)(A))**
**Presenting or Causing False Claims to Be Presented (Reckless Underwriting)**

102. The Relator incorporates by reference paragraphs 1 through 101 of his First Amended Complaint as if fully set forth herein.

103. Relator seeks relief against JP Morgan Chase under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. §3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

104. As set forth above, from 2001 to the present date, JP Morgan Chase engaged in a regular practice of reckless origination and underwriting of its FHA loans. During that time JP Morgan Chase's senior management was aware of the very serious loan quality problems that the bank was experiencing with respect to it FHA loans. Similarly, JP Morgan Chase's underwriters knew, or should have known, that a substantial portion of the bank's FHA loans during this time period did not meet the FHA loan program parameters, contained unacceptable risk, and were ineligible for FHA insurance. Nonetheless, JP Morgan Chase certified FHA loans for insurance, and thereby falsely certified thousands of FHA loans were eligible for insurance when they were not.

105. JP Morgan Chase knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, caused false or fraudulent claims for FHA insurance to be presented to an officer or employee of the United States of America. JP Morgan Chase did so by, *inter alia*, submitting false loan-level certifications for FHA loans to HUD in order to get FHA to endorse these mortgages that did not meet HUD requirements and contained unacceptable risk for FHA insurance, and then selling the mortgage loans to third parties whom

JP Morgan Chase knew would submit insurance claims in the event the mortgage loans defaulted.

106. JP Morgan Chase knowingly, or acting with deliberate ignorance and/or reckless disregard for the truth, presented to an officer or employee of the United States of America false or fraudulent claims for payment when it submitted claims for FHA insurance for defaulted loans that JP Morgan Chase falsely certified were eligible for FHA insurance.

107. A truthful individual loan certification for FHA endorsement is a condition of payment of FHA insurance on that loan. HUD paid insurance claims, and incurred losses, on these retail FHA loans that JP Morgan Chase falsely certified were eligible for HUD insurance.

108. By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

**SECOND CLAIM**

**Violations of the False Claims Act**
**(31 U.S.C. §3729(a)(2) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(B))**
**Use of False Statements in Support of False Claims (Reckless Underwriting)**

109. The Relator incorporates by reference paragraphs 1 through 108 of his First Amended Complaint as if fully set forth herein.

110. The United States of America seeks relief against JP Morgan Chase under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. §3729(a)(2) (2006), and, as amended, Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. §3729(a)(1)(B).

111. As set forth above, from 2001 through the present date, JP Morgan Chase knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims with respect to the thousands of FHA loans that JP Morgan Chase falsely certified were

eligible for FHA insurance. Specifically, during this period, JP Morgan Chase knowingly submitted thousands of false individuals FHA loan certifications to HUD representing, *inter alia*, that each loan was eligible for HUD mortgage insurance under the Direct Endorsement program. JP Morgan Chase submitted the false loan certifications to induce FHA to endorse the mortgages for insurance and to get HUD to pay false insurance claims when the mortgages defaulted. In addition, JP Morgan Chase submitted and caused to be submitted false records and statements to HUD in connection with claims that were submitted for FHA insurance for defaulted loans that JP Morgan Chase had falsely certified were eligible for FHA insurance.

112. A truthful individual loan certification for FHA endorsement is a condition of payment of FHA insurance on that loan. HUD paid insurance claims, and incurred losses, on these retail FHA loans that JP Morgan Chase falsely certified were eligible for HUD insurance.

113. By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

**THIRD CLAIM**

**Violations of the False Claims Act**
**(31 U.S.C. §3729(a)(1) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(A))**
**Presenting or Causing False Claims to Be Presented (Self-Reporting)**

114. The Relator incorporates by reference paragraphs 1 through 113 of his First Amended Complaint as if fully set forth herein.

115. The United States of America seeks relief against JP Morgan Chase under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. §3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

116. As set forth above, from 2001 through the present date, JP Morgan Chase intentionally failed to self-report to HUD, as required, the FHA loans that it knew failed to meet

the FHA loan program parameters, contained an unacceptable level of risk, and were not eligible for HUD Insurance. JP Morgan Chase's failure to self-report these loans evidences JP Morgan Chase's intent to knowingly present or cause to be presented false or fraudulent claims for FHA insurance. Moreover, with knowledge that those loans were ineligible for HUD insurance, JP Morgan Chase submitted the claims or caused the claims to be submitted for, and was paid FHA insurance on, nearly all of those loans for which claims were submitted. Likewise, with knowledge that those loans were ineligible for HUD insurance, JP Morgan Chase sold some of the loans to third parties knowing that the third parties would submit claims for insurance in the even these deficient loans defaulted.

117.   JP Morgan Chase knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, caused to be presented to an officer or employee of the United States of America, false and fraudulent claims for payment or approval. JP Morgan Chase submitted false loan-level certifications to HUD to induce FHA to endorse these mortgages for FHA insurance and failed to self-report these mortgages that the bank knew failed to meet the FHA loan program parameters, contained an unacceptable level of risk, and were not eligible for HUD insurance. JP Morgan Chase did so knowing that the third parties to whom JP Morgan Chase had sold these FHA loans or who were servicing these FHA loans would submit false claims for insurance when the loans defaulted.

118.   JP Morgan Chase knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented to an officer or employee of the United States of America, false and fraudulent claims for payment when it submitted claims for FHA insurance in connection with these defaulted loans that the bank knew failed to meet the FHA loan program

parameters, contained an unacceptable level of risk, had not been self-reported to HUD, and were not eligible for HUD insurance.

119. A truthful individual loan certification for FHA endorsement is a condition of payment of FHA insurance on that loan. HUD paid insurance claims, and incurred losses, on these loans that JP Morgan Chase wrongfully failed to self-report to HUD.

120. By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

**FOURTH CLAIM**
**Violations of the False Claims Act**
**(31 U.S.C. §3729(a)(2) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(B))**
**Use of False Statements in Support of False Claims (Self-Reporting)**

121. The Relator incorporates by reference paragraphs 1 through 120 of his First Amended Complaint as if fully set forth herein.

122. The United States of America seeks relief against JP Morgan Chase under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. §3729(a)(2) (2006), and, as amended, Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. §3729(a)(1)(B).

123. As set forth above, JP Morgan Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims for FHA insurance with respect to at least the 6,320 loans that JP Morgan Chase knew failed to meet the FHA loan program parameters, contained an unacceptable level of risk, and were not eligible for HUD insurance.

124. Between 2001 and the present date, JP Morgan Chase made numerous false statements and used numerous false records to get false claims for FHA insurance paid by HUD. The false statements and false records that JP Morgan Chase made and/or used include, but are

not limited to: (1) JP Morgan Chase's annual certifications from 2002 through the current date submitted to HUD in which the bank certified *inter alia*, that it conformed to all regulations necessary to maintain its HUD-FHA approval, (2) JP Morgan Chase's self-reports of loans to HUD from 2001 through the current date, which knowingly omitted seriously deficient loans, and (3) JP Morgan Chase's loan level certifications for the loans which JP Morgan Chase knew were false after the QA review was performed on these loans and which were used to get false or fraudulent claims for FHA insurance paid for these loans. In addition, JP Morgan Chase submitted and caused to be submitted false records and statements to HUD in connection with claims that were submitted for FHA insurance for defaulted loans that JP Morgan Chase had falsely certified were eligible for FHA insurance.

125. A truthful individual loan certification for FHA endorsement is a condition of payment of FHA insurance on that loan. HUD paid insurance claims, and incurred losses, relating to these FHA mortgages that JP Morgan Chase falsely certified were eligible for HUD insurance and failed to self-report as required.

126. By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## FIFTH CLAIM
**Violations of the False Claims Act**
**(31 U.S.C. §3729(a)(7) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(g))**
**Reverse False Claim (Self-Reporting)**

127. The Relator incorporates by reference paragraphs 1 through 126 of his First Amended Complaint as if fully set forth herein.

128.    The United States of America seeks relief against JP Morgan Chase under Section 3729(a)(7) of the False Claims Act, 31 U.S.C. §3729(a)(7) (2006), and, as amended, Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. §3729(a)(1)(G).

129.    As set forth above, JP Morgan Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used or caused to be made or used false records and/or statements material to an obligation to pay or transmit money or property to the United States, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.  The false statements and false records that JP Morgan Chase made and/or used to avoid its obligation to indemnify HUD for loans that the bank had internally identified as not meeting HUD's requirements and containing unacceptable risk include, but are not limited to:  (1) JP Morgan Chase's annual certifications from 2002 through the current date submitted to HUD in which the bank certified, *inter alia*, that it conformed to all regulations necessary to maintain its HUD-FHA approval, (2) JP Morgan Chase's self-reports of loans to HUD from 2001 through the current date, which knowingly omitted seriously deficient loans, (3) JP Morgan Chase's loan level certifications which JP Morgan Chase knew were false after the QA review was performed on these loans, and (4) JP Morgan Chase's filing of claims for FHA insurance on those same loans.

130.    A truthful individual loan certification for FHA endorsement is a condition of payment of FHA insurance on that loan.  The United States of America paid insurance claims, and incurred losses, as a result of JP Morgan Chase's false records and false statements that concealed its obligations to indemnify HUD.

131. By virtue of the false records or statements made by JP Morgan Chase, the United States of America suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

**SIXTH CLAIM**
**Violations of the False Claims Act**
**(31 U.S.C. § 3729 (a)(1) (2006), and, as amended, 31 U.S.C. § 3729 (a)(1)(A))**
**Presenting or Causing False Claims to Be Presented (Reckless Underwriting)**

132. The Relator incorporates by reference paragraphs 1 through 131 of his First Amended Complaint as if fully set forth herein.

133. The Relator seeks relief against JP Morgan Chase under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. §3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

134. As set forth above, from 2001 to the current date, JP Morgan Chase engaged in a regular practice of reckless origination and underwriting of its VA loans. During that time JP Morgan Chase's senior management was aware of the very serious loan quality problems that the bank was experiencing with respect to it VA loans. Similarly, JP Morgan Chase's underwriters knew, or should have known, that a substantial portion of the bank's VA loans during this time period did not meet the VA loan program parameters, contained unacceptable risk, and were ineligible for VA guarantee. Nonetheless, JP Morgan Chase certified VA loans for guarantees, and thereby falsely certified thousands of VA loans were eligible for guarantees when they were not.

135. JP Morgan Chase knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, caused false or fraudulent claims for VA guarantees to be presented to an officer or employee of the United States of America. JP Morgan Chase did so by, *inter alia*, submitting false loan-level certifications for VA loans to VA in order to get VA to

endorse these mortgages that did not meet VA requirements and contained unacceptable risk for VA guarantees, and then selling the mortgage loans to third parties whom JP Morgan Chase knew would submit guarantee claims in the event the mortgage loans defaulted.

136. JP Morgan Chase knowingly, or acting with deliberate ignorance and/or reckless disregard for the truth, presented to an officer or employee of the United States of America false or fraudulent claims for payment when it submitted claims for VA guarantees for defaulted loans that JP Morgan Chase falsely certified were eligible for VA guarantees.

137. A truthful individual loan certification for VA endorsement is a condition of payment of VA guarantee on that loan. VA paid guarantee claims, and incurred losses, on these retail VA loans that JP Morgan Chase falsely certified were eligible for VA guarantee.

138. By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

**<u>SEVENTH CLAIM</u>**
**Violations of the False Claims Act**
**(31 U.S.C. §3729(a)(2) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(B))**
**Use of False Statements in Support of False Claims (Reckless Underwriting)**

139. The Relator incorporates by reference paragraphs 1 through 138 of his First Amended Complaint as if fully set forth herein.

140. The Relator seeks relief against JP Morgan Chase under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. §3729(a)(2) (2006), and, as amended, Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. §3729(a)(1)(B).

141. As set forth above, from 2001 through the current date, JP Morgan Chase knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent

claims with respect to the thousands of VA loans that JP Morgan Chase falsely certified were eligible for VA guarantees. Specifically, during this period, JP Morgan Chase knowingly submitted thousands of false individuals VA loan certifications to VA representing, *inter alia*, that each loan was eligible for VA mortgage guarantees. JP Morgan Chase submitted the false loan certifications to induce VA to endorse the mortgages for guarantees and to get VA to pay false guarantee claims when the mortgages defaulted. In addition, JP Morgan Chase submitted and caused to be submitted false records and statements to VA in connection with claims that were submitted for VA guarantees for defaulted loans that JP Morgan Chase had falsely certified were eligible for VA guarantees.

142. A truthful individual loan certification for VA endorsement is a condition of payment of VA guarantee on that loan. VA paid guarantee claims, and incurred losses, on these retail VA loans that JP Morgan Chase falsely certified were eligible for VA guarantee.

143. By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## EIGHTH CLAIM

**Violations of the False Claims Act**
**(31 U.S.C. §3729(a)(1) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(A))**
**Presenting or Causing False Claims to Be Presented (Self-Reporting)**

144. The Relator incorporates by reference paragraphs 1 through 143 of his First Amended Complaint as if fully set forth herein.

145. The United States of America seeks relief against JP Morgan Chase under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. §3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

146.    As set forth above, from 2001 through the current date, JP Morgan Chase intentionally failed to self-report to VA, as required, the VA loans that it knew failed to meet the VA loan program parameters, contained an unacceptable level of risk, and were not eligible for VA guarantee.  JP Morgan Chase's failure to self-report these loans evidences JP Morgan Chase's intent to knowingly present or cause to be presented false or fraudulent claims for VA guarantee.  Moreover, with knowledge that those loans were ineligible for VA guarantee, JP Morgan Chase submitted the claims or caused the claims to be submitted for, and was paid VA guarantee on, nearly all of those loans for which claims were submitted.  Likewise, with knowledge that those loans were ineligible for VA guarantee, JP Morgan Chase sold some of the loans to third parties knowing that the third parties would submit claims for guarantee in the even these deficient loans defaulted.

147.    JP Morgan Chase knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, caused to be presented to an officer or employee of the United States of America, false and fraudulent claims for payment or approval.  JP Morgan Chase submitted false loan-level certifications to VA to induce VA to endorse these mortgages for VA guarantee and failed to self-report these mortgages that the bank knew failed to meet the VA loan program parameters, contained an unacceptable level of risk, and were not eligible for VA guarantee.  JP Morgan Chase did so knowing that the third parties to whom JP Morgan Chase had sold these VA loans or who were servicing these VA loans would submit false claims for guarantee when the loans defaulted.

148.    JP Morgan Chase knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented to an officer or employee of the United States of America, false and fraudulent claims for payment when it submitted claims for VA guarantee in

connection with these defaulted loans that the bank knew failed to meet the VA loan program parameters, contained an unacceptable level of risk, had not been self-reported to VA, and were not eligible for VA guarantee.

149. A truthful individual loan certification for VA endorsement is a condition of payment of VA guarantee on that loan. VA paid guarantee claims, and incurred losses, on these loans that JP Morgan Chase wrongfully failed to self-report to VA.

150. By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

**NINTH CLAIM**
**Violations of the False Claims Act**
**(31 U.S.C. §3729(a)(2) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(B))**
**Use of False Statements in Support of False Claims (Self-Reporting)**

151. The Relator incorporates by reference paragraphs 1 through 150 of his First Amended Complaint as if fully set forth herein.

152. The Relator seeks relief against JP Morgan Chase under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. §3729(a)(2) (2006), and, as amended, Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. §3729(a)(1)(B).

153. As set forth above, JP Morgan Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims for VA guarantee with respect to at least the 6,320 loans that JP Morgan Chase knew failed to meet the VA loan program parameters, contained an unacceptable level of risk, and were not eligible for VA guarantee.

154. Between 2001 and the current date, JP Morgan Chase made numerous false statements and used numerous false records to get false claims for VA guarantee paid by VA.

The false statements and false records that JP Morgan Chase made and/or used include, but are not limited to: (1) JP Morgan Chase's certifications from 2002 through the current date submitted to VA in which the bank certified *inter alia*, that it conformed to all regulations necessary to maintain its VA-VA approval, (2) JP Morgan Chase's self-reports of loans to VA from 2001 through 2010, which knowingly omitted seriously deficient loans, and (3) JP Morgan Chase's loan level certifications for the loans which JP Morgan Chase knew were false after the QA review was performed on these loans and which were used to get false or fraudulent claims for VA guarantee paid for these loans. In addition, JP Morgan Chase submitted and caused to be submitted false records and statements to VA in connection with claims that were submitted for VA guarantee for defaulted loans that JP Morgan Chase had falsely certified were eligible for VA guarantee.

155. A truthful individual loan certification for VA endorsement is a condition of payment of VA guarantee on that loan. VA paid guarantee claims, and incurred losses, relating to these VA mortgages that JP Morgan Chase falsely certified were eligible for VA guarantee and failed to self-report as required.

156. By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

**TENTH CLAIM**
**Violations of the False Claims Act**
**(31 U.S.C. §3729(a)(7) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(g))**
**Reverse False Claim (Self-Reporting)**

157. The Relator incorporates by reference paragraphs 1 through 156 of his First Amended Complaint as if fully set forth herein.

158.    The Relator seeks relief against JP Morgan Chase under Section 3729(a)(7) of the False Claims Act, 31 U.S.C. §3729(a)(7) (2006), and, as amended, Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. §3729(a)(1)(G).

159.    As set forth above, JP Morgan Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used or caused to be made or used false records and/or statements material to an obligation to pay or transmit money or property to the United States, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States. The false statements and false records that JP Morgan Chase made and/or used to avoid its obligation to indemnify VA for loans that the bank had internally identified as not meeting VA's requirements and containing unacceptable risk include, but are not limited to: (1) JP Morgan Chase's certifications from 2002 through the current date submitted to VA in which the bank certified, *inter alia*, that it conformed to all regulations necessary to maintain its VA-VA approval, (2) JP Morgan Chase's self-reports of loans to VA from 2001 through the current date, which knowingly omitted seriously deficient loans, (3) JP Morgan Chase's loan level certifications which JP Morgan Chase knew were false after the QA review was performed on these loans, and (4) JP Morgan Chase's filing of claims for VA guarantee on those same loans.

160.    A truthful individual loan certification for VA endorsement is a condition of payment of VA guarantee on that loan. The United States of America paid guarantee claims, and incurred losses, as a result of JP Morgan Chase's false records and false statements that concealed its obligations to indemnify VA.

161.    By virtue of the false records or statements made by JP Morgan Chase, the United States of America suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

WHEREFORE, the Relator respectfully request that judgment be entered in its favor and against JP Morgan Chase as follows:

   a.    On Counts One, Two, Three, Four, Five, Six, Seven, Eight, Nine, and Ten (False Claims Act), judgment for the United States of America, treble the Relator's damages, and civil penalties for the maximum amount allowed by law;

   b.    For an award of costs and fees pursuant to 31 U.S.C. § 3729(a);

   c.    For an award of any such further relief as is proper; and

   d.    Attorneys' fees, if applicable.


Respectfully Submitted,


David G. Wasinger, SDNYBar # DW3825
The Wasinger Law Group, P.C.
1401 S. Brentwood Blvd., Ste. 875
St. Louis, MO 63144
PH: 314-961-0400
FAX: 314-961-2726
dwasinger@wasingerlawgroup.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered, this 2nd day of April, 2013, to:

Christopher B. Harwood
Assistant United States Attorney
Southern District of New York
86 Chambers Street
New York, NY 10007

# FHA Top 10 Retail Documents with Findings

## As of Week Ending 12/02/05







Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"
- Production Matrix - "Required FHA Document List - Accountability"

Notes:

(1) Data represents FHA Document Findings Only.

(2) Retail includes Joint Venture & HLD totals.

EXHIBIT 1

# FHA Top 10 Wholesale Documents with Findings

## As of Week Ending 12/02/05



Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"
- Production Matrix - "Required FHA Document List - Accountability"

Notes:
(1) Data represents FHA Document Findings Only.
(2) Retail includes Joint Venture & HLD totals.

# FHA NOR Activity
## Top 10 by Channel
### 2005 Year-to-Date

| Document Responsibility | Loan Officer | Processor | Closer | Underwriter | Government Insuring | Third Party | Total Document NOR's |
|---|---|---|---|---|---|---|---|
| **Retail Document NOR** | | | | | | | |
| Late Letter | | | | | 102 | | 102 |
| Addendum to URLA (page 1) | | 56 | | | | | 56 |
| Note | | | 52 | | | | 52 |
| Addendum to URLA (page 4) | | | 51 | | | | 51 |
| Addendum to URLA (page 3) | | | | 50 | | | 50 |
| CAIVRS | | | | | 49 | | 49 |
| Security Instrument | | | 46 | | | | 46 |
| Data Entry Error | | | | | 43 | | 43 |
| Mortgage Credit Analysis Worksheet (MCAW) | | | | 42 | | | 42 |
| HUD-1 Settlement Statement | | | | | | 41 | 41 |
| Retail Top 10 Total: | 0 | 56 | 149 | 92 | 194 | 41 | 532 |
| Retail Document NOR Total: | 162 | 60 | 184 | 149 | 233 | 279 | 1,067 |

| Document Responsibility | Broker | Processor | Closer | Underwriter | Government Insuring | Third Party | Total Document NOR's |
|---|---|---|---|---|---|---|---|
| **Wholesale Document NOR** | | | | | | | |
| Late Letter | | | | | 135 | | 135 |
| Addendum to URLA (page 1) | | 86 | | | | | 86 |
| Data Entry Error | | | | | 70 | | 70 |
| Addendum to URLA (page 3) | | | | 69 | | | 69 |
| Mortgage Credit Analysis Worksheet (MCAW) | | | | 63 | | | 63 |
| CAIVRS | | | | | 62 | | 62 |
| Security Instrument | | | 57 | | | | 57 |
| Note | | | 52 | | | | 52 |
| Addendum to URLA (page 4) | | | 48 | | | | 48 |
| Notice to the Homebuyer (Homebuyer Summary) | | | | | | 47 | 47 |
| Wholesale Top 10 Total: | 0 | 86 | 157 | 132 | 267 | 47 | 689 |
| Wholesale Document NOR Total: | 170 | 103 | 207 | 210 | 305 | 291 | 1,286 |
| Total FHA Document NOR's: | 332 | 163 | 391 | 359 | 538 | 570 | 2,353 |

Data Sources:

- FHA Connection - NOR Activity
- Production Matrix - "Required FHA Document List – Accountability"

Notes:

(1) Data represents 1,524 loans rejected by FHA; VA NOR Document list not available.

# FHA Scorecard
## Activity Trending

| Week Ending | Loans Reviewed | Loans with Findings | % of Loans with Findings | Document Findings | Production Accountability | Underwriter Accountability | Avg Findings Per Loans Reviewed |
|---|---|---|---|---|---|---|---|
| **Retail Loans** | | | | | | | |
| 11/11 | 105 | 65 | 62% | 146 | 84 | 62 | 1.4 |
| 11/18 | 84 | 51 | 61% | 152 | 87 | 65 | 1.8 |
| 11/25 | 42 | 21 | 50% | 58 | 32 | 25 | 1.4 |
| 12/02 | 73 | 47 | 64% | 150 | 86 | 63 | 2.1 |
| Retail December MTD | 29 | 18 | 62% | 46 | 27 | 19 | 1.6 |
| **Wholesale Loans** | | | | | | | |
| 11/11 | 24 | 11 | 46% | 49 | 32 | 16 | 2.0 |
| 11/18 | 32 | 22 | 69% | 81 | 39 | 41 | 2.5 |
| 11/25 | 20 | 14 | 70% | 73 | 40 | 31 | 3.7 |
| 12/02 | 56 | 40 | 71% | 122 | 64 | 58 | 2.2 |
| Retail December MTD | 19 | 15 | 79% | 51 | 24 | 27 | 2.7 |
| **Total FHA Loans** | | | | | | | |
| 11/11 | 129 | 76 | 59% | 195 | 116 | 78 | 1.5 |
| 11/18 | 116 | 73 | 63% | 233 | 126 | 106 | 2.0 |
| 11/25 | 62 | 35 | 56% | 131 | 72 | 56 | 2.1 |
| 12/02 | 129 | 87 | 67% | 272 | 150 | 121 | 2.1 |
| December MTD | 48 | 33 | 69% | 97 | 51 | 46 | 2.0 |

Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"

Notes:

(1) Data represents FHA Only.
(2) Retail includes Joint Venture and HLD totals.
(3) There are 0 document findings on the December MTD Scorecard that are GI Accountability.

# FHA Total Document Findings
# Production Accountability Weekly Trending







# FHA Total Document Findings
# Production Accountability
## Month-to-Date 12/02/05

| Document Responsibility | Processor (CHF) | Underwriter (CHF) | Closer (CHF) | Third Party (3rd) | Total Document Findings |
|---|---|---|---|---|---|
| **Retail Document Findings** | | | | | |
| HUD-1 Settlement Statement | | | | 4 | 4 |
| Addendum to URLA (page 1) | 3 | | | | 3 |
| Addendum to URLA (page 4) | | | 3 | | 3 |
| Statement of Appraised Value (Conditional Commitment) | | 3 | | | 3 |
| Statement of Limiting Conditions | | | | 3 | 3 |
| Uniform Residential Appraisal Report-URAR (or equivalent-CRV/NOV/MAR) | | | | 3 | 3 |
| Note | | | 2 | | 2 |
| Warranty of Completion of Construction | | | | 2 | 2 |
| Wood Destroying Insect Infestation Report | | | | 2 | 2 |
| Compliance Inspection Report or equivalent | | | | 1 | 1 |
| Security Instrument | | | 1 | | 1 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| Retail Total: | 3 | 3 | 6 | 15 | 27 |

Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"
- Production Matrix - "Required FHA Document List - Accountability"

Notes:

(1) Data represents FHA Document Findings Only.

(2) Retail includes Joint Venture & HLD totals.

# FHA Total Document Findings
# Production Accountability, Con't
## Month-to-Date 12/02/05

| Document Responsibility | Broker (CHF) | Underwriter (CHF) | Closer (CHF) | Third Party (3rd) | Total Document Findings |
|---|---|---|---|---|---|
| **Wholesale Document Findings** | | | | | |
| Addendum to URLA (page 1) | 7 | | | | 7 |
| Statement of Appraised Value (Conditional Commitment) | | 7 | | | 7 |
| 10-Year Warranty Acceptance or equivalent | | | | 2 | 2 |
| Addendum to URLA (page 4) | | | 2 | | 2 |
| Uniform Residential Appraisal Report-URAR (or equivalent-CRV/NOV/MAR) | | | | 2 | 2 |
| FHA Addendum to Settlement Statement | | | 1 | | 1 |
| HUD-1 Settlement Statement | | | | 1 | 1 |
| Note | | | 1 | | 1 |
| Warranty of Completion of Construction | | | | 1 | 1 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| Wholesale Total: | 7 | 7 | 4 | 6 | 24 |
| **Total FHA Document Findings:** | 10 | 10 | 10 | 21 | 51 |

Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"
- Production Matrix - "Required FHA Document List - Accountability"

Notes:

(1) Data represents FHA Document Findings Only.
(2) Retail includes Joint Venture & HLD totals.

# FHA Total Document Findings
## Underwriter Accountability Weekly Trending









# FHA Total Document Findings
## Underwriter Accountability
### Month-to-Date 12/02/05

| Document Responsibility | Loan Officer (CHF) | Processor (CHF) | Underwriter (CHF) | Third Party (3rd) | Total Document Findings |
|---|---|---|---|---|---|
| **Retail Document Findings** | | | | | |
| Addendum to URLA (page 3) | | | 2 | | 2 |
| Evidence of Social Security Number | 2 | | | | 2 |
| Mortgage Credit Analysis Worksheet (MCAW) | | | 2 | | 2 |
| Notice to the Homebuyer (Homebuyer Summary) | | | | 2 | 2 |
| Pay-off Statement | | 2 | | | 2 |
| Purchase / Sales Contract | | | | 2 | 2 |
| Uniform Residential Loan Application (URLA) | 2 | | | | 2 |
| Amendatory Clause | 1 | | | | 1 |
| Asset Verification | 1 | | | | 1 |
| Builder's Certification of Plans and Specifications | | | | 1 | 1 |
| Notice to the Lender (VC Sheets) | | | | 1 | 1 |
| Real Estate Certification | 1 | | | | 1 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| **Sketch** | **7** | **2** | **4** | **6** | **19** |

Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"
- Production Matrix - "Required FHA Document List - Accountability"

Notes:

(1) Data represents FHA Document Findings Only.
(2) Retail includes Joint Venture & HLD totals.

# FHA Total Document Findings
# Underwriter Accountability, Con't
## Month-to-Date 12/02/05

| Document Responsibility | Broker (CHF) | Processor (CHF) | Underwriter (CHF) | Third Party (3rd) | Total Document Findings |
|---|---|---|---|---|---|
| **Wholesale Document Findings** | | | | | |
| Addendum to URLA (page 3) | | | 5 | | 5 |
| Notice to the Lender (VC Sheets) | | | | 3 | 3 |
| Real Estate Certification | 3 | | | | 3 |
| Automated Underwriting Feedback Certificate | | | 2 | | 2 |
| Gift Documentation | 2 | | | | 2 |
| Mortgage Credit Analysis Worksheet (MCAW) | | | 2 | | 2 |
| Notice to the Homebuyer (Homebuyer Summary) | | | | 2 | 2 |
| Purchase / Sales Contract | | | | 2 | 2 |
| Amendatory Clause | 1 | | | | 1 |
| Asset Verification | 1 | | | | 1 |
| Builder's Certification of Plans and Specifications | | | | 1 | 1 |
| For Your Protection: Get a Home Inspection | 1 | | | | 1 |
| Income Verification | 1 | | | | 1 |
| Uniform Residential Loan Application (URLA) | 1 | | | | 1 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| **Wholesale Total:** | 10 | 0 | 9 | 8 | 27 |
| **Total FHA Document Findings:** | 17 | 2 | 13 | 14 | 46 |

Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"
- Production Matrix - "Required FHA Document List - Accountability"

Notes:

(1) Data represents FHA Document Findings Only.
(2) Retail includes Joint Venture & HLD totals.

# VA Scorecard
## Activity Trending

| Week Ending | Loans Reviewed | Loans with Findings | % of Loans with Findings | Document Findings | Production Accountability | Underwriter Accountability | Avg Findings Per Loans Reviewed |
|---|---|---|---|---|---|---|---|
| **Retail Loans** | | | | | | | |
| 11/11 | 27 | 12 | 44% | 24 | 13 | 11 | 0.9 |
| 11/18 | 46 | 24 | 52% | 34 | 19 | 12 | 0.7 |
| 11/25 | 17 | 9 | 53% | 14 | 4 | 9 | 0.8 |
| 12/02 | 34 | 17 | 50% | 30 | 14 | 14 | 0.9 |
| Retail December MTD | 15 | 6 | 40% | 9 | 3 | 6 | 0.6 |
| **Wholesale Loans** | | | | | | | |
| 11/11 | 21 | 10 | 48% | 15 | 11 | 2 | 0.7 |
| 11/18 | 31 | 20 | 65% | 30 | 16 | 7 | 1.0 |
| 11/25 | 11 | 4 | 36% | 13 | 8 | 4 | 1.2 |
| 12/02 | 25 | 14 | 56% | 22 | 13 | 6 | 0.9 |
| Wholesale December MTD | 7 | 4 | 57% | 6 | 3 | 2 | 0.9 |
| **Total VA Loans** | | | | | | | |
| 11/11 | 48 | 22 | 46% | 39 | 24 | 13 | 0.8 |
| 11/18 | 77 | 44 | 57% | 64 | 35 | 19 | 0.8 |
| 11/25 | 28 | 13 | 46% | 27 | 12 | 13 | 1.0 |
| 12/02 | 59 | 31 | 53% | 52 | 27 | 20 | 0.9 |
| December MTD | 22 | 10 | 45% | 15 | 6 | 8 | 0.7 |

Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"

Notes:

(1) Data represents VA Only.

(2) There is 1 document finding on the December MTD Scorecard that is GI Accountability.

# VA Total Document Findings
## Production Accountability Weekly Trending



# VA Total Document Findings
## Production Accountability
### Month-to-Date 12/02/05

| Document Responsibility | Processor (CHF) | Underwriter (CHF) | Closer (CHF) | Third Party (3rd) | Total Document Findings |
|---|---|---|---|---|---|
| **Retail Document Findings** | | | | | |
| Report and Certification of Loan Disbursement | | | 2 | | 2 |
| HUD-1 Settlement Statement | | | | 1 | 1 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | |
| | | | | | |
| Retail Total: | 0 | 0 | 2 | 1 | 3 |

| Document Responsibility | Broker (CHF) | Underwriter (CHF) | Closer (CHF) | Third Party (3rd) | Total Document Findings |
|---|---|---|---|---|---|
| **Wholesale Document Findings** | | | | | |
| Uniform Residential Loan Application (URLA) | 2 | | | | 2 |
| Addendum to URLA (page 1) | 1 | | | | 1 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| Wholesale Total: | 3 | 0 | 0 | 0 | 3 |
| Total FHA Document Findings: | 3 | 0 | 2 | 1 | 6 |

Data Sources:
- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"
- Production Matrix - "Required FHA/VA Document List - Accountability"

Notes:
(1) Data represents VA Document Findings Only..
(2) Retail includes Joint Venture & HLD totals.

# VA Total Document Findings
## Underwriter Accountability Weekly Trending



# VA Total Document Findings
## Underwriter Accountability
### Month-to-Date 12/02/05

| Document Responsibility | Loan Officer (CHF) | Processor (CHF) | Underwriter (CHF) | Third Party (3rd) | Total Document Findings |
|---|---|---|---|---|---|
| **Retail Document Findings** | | | | | |
| Certificate of Eligibility | | | 3 | | 3 |
| Cert that vet still active duty | | 1 | | | 1 |
| IRRRL Lender Certification (** for IRRRL Refinance only) | | | 1 | | 1 |
| IRRRL Worksheet | | | 1 | | 1 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| Retail Total: | 0 | 1 | 5 | 0 | 6 |

| Document Responsibility | Broker (CHF) | Processor (CHF) | Underwriter (CHF) | Third Party (3rd) | Total Document Findings |
|---|---|---|---|---|---|
| **Wholesale Document Findings** | | | | | |
| 4/5 Point Questionnaire (If required) | | | 1 | | 1 |
| Certificate of Eligibility | | | 1 | | 1 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| | | | | | 0 |
| Wholesale Total: | 0 | 0 | 2 | 0 | 2 |
| Total FHA Document Findings: | 0 | 1 | 7 | 0 | 8 |

Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"
- Production Matrix - "Required FHA/VA Document List - Accountability"

Notes:

(1) Data represents VA Document Findings Only..

(2) Retail includes Joint Venture & HLD totals.

# VA Total Document Findings
## Government Insuring Accountability Weekly Trending



# VA Total Document Findings
## Government Insuring Accountability
### Month-to-Date 12/02/05

| Document Responsibility | Processor (CHF) | Underwriter (CHF) | Closer (CHF) | Government Insuring | Total Document Findings |
|---|---|---|---|---|---|
| **Retail Document Findings** | | | | | |
| Funding Fee Payment Receipt | | | | 0 | 0 |
| **Retail Total:** | 0 | 0 | 0 | 0 | 0 |

| Document Responsibility | Broker (CHF) | Underwriter (CHF) | Closer (CHF) | Government Insuring | Total Document Findings |
|---|---|---|---|---|---|
| **Wholesale Document Findings** | | | | | |
| Funding Fee Payment Receipt | | | | 1 | 1 |
| **Wholesale Total:** | 0 | 0 | 0 | 1 | 1 |
| **Total VA Document Findings:** | 0 | 0 | 0 | 1 | 1 |

Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"
- Production Matrix - "Required FHA/VA Document List - Accountability"

Notes:

(1) Data represents VA Document Findings Only..

(2) Retail includes Joint Venture & HLD totals.



# VA Top 10 Retail Documents with Findings

## As of Week Ending 12/02/05

Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"

Note:

(1) Data represents VA Document Findings Only



# VA Top 10 Wholesale Documents with Findings

## As of Week Ending 12/02/05

Top Wholesale Documents with Findings - MTD
4
2
0
100%
80%
60%
40%
20%
0%
2
1
1
1
1
33%
50%
67%
83%
100%
URLA
4/5 Point Questionnaire
Addendum to URLA
Certificate of Eligibility
Funding Fee Payment Receipt
Top 10 Wholesale Documents with Findings - YTD
800
600
400
200
0
685
630
266
214
124
118
106
91
68
48
24%
47%
56%
64%
68%
72%
76%
79%
82%
83%
Funding Fee Payment Receipt
Report and Certification of Loan Disbursement
Addendum to URLA
HUD-1 Settlement Statement
Certificate of Eligibility
Lenders Loan Quality Certification
URLA
4/5 Point Questionnaire
Wood Destroying Insect Infestation Report
Counseling Checklist for Military Homebuyers

Data Sources:

- Centralized Database GI Quality Gate - "First Review Accountability Channel Summary"

Note:

(1) Data represents VA Document Findings Only

# Government Insuring





# Inventory

Government Insuring Inventory
1,800
900
0
1,528 1,499 1,337 1,172 1,095 1,069 1,053 920 855 956 844 710 720 837 832 765 618 502 565 484 460 444 487 504 494 453
Actual
6-10 6-17 6-24 7-1 7-8 7-15 7-22 7-29 8-5 8-12 8-19 8-26 9-2 9-9 9-16 9-23 9-30 10-7 10-14 10-21 10-28 11-04 11-11 11-18 11-25 12/02
Week Ending
Government Insuring Inventory > 60 Days
1,000
500
0
728 632 576 468 418 350 289 256 188 165 107 95 93 90 90 108 79 66 66 48 49 34 41 34 41 46
Actual > 60
6-10 6-17 6-24 7-1 7-8 7-15 7-22 7-29 8-5 8-12 8-19 8-26 9-2 9-9 9-16 9-23 9-30 10-7 10-14 10-21 10-28 11-04 11-11 11-18 11-25 12/02
Week Ending

# Government Insuring Inventory and Activity

| Government Insuring | 14-Oct | 21-Oct | 28-Oct | 4-Nov | 11-Nov | 18-Nov | 25-Nov | 2-Dec |
|---|---|---|---|---|---|---|---|---|
| Files Submitted to Agency | 255 | 257 | 232 | 187 | 197 | 202 | 247 | 167 |
| Files Rejected by Agency | 14 | 13 | 18 | 15 | 14 | 13 | 11 | 21 |
| Unsubmitted Inventory (BAU) | 296 | 214 | 210 | 242 | 276 | 289 | 236 | 265 |
| Uninsured Inventory | 565 | 484 | 460 | 444 | 487 | 504 | 494 | 453 |
| Uninsured Inventory > 60 Days | 66 | 48 | 49 | 34 | 41 | 34 | 41 | 46 |

